## WOLFE et al. v. WHITE et ux.

No. 7153. Decided September 1, 1948. (197 P. 2d 125.)

See 51 C. J. S., Landlord and Tenant, sec. 368. Validity, construction, application and effect of provision of lease exempting landlord from liability on account of condition of property, see note, 84 A. L. R. 654. See, also, 32 Am. Jur. 615.

*Shirley P. Jones* and *Rich & Strong,* all of Salt Lake City, for appellants.

*H. L. Mulliner* and *Jesse R. S. Budge,* all of Salt Lake City, for respondents.

PRATT, Justice.

This appeal comes to us upon the pleadings only. A general demurrer was sustained to the complaint of the lessees as amended and the action dismissed. (A motion to strike and a special demurrer were denied and overruled.) The issue involved is this: Was it the obligation of the lessors, or the obligation of the lessees, under the terms of the following written lease, to remedy a condition of the roof of the leased premises characterized by the Salt Lake City building authorities as unsafe. These authorities characterized the building as unsafe upon the bases set out in their letters, parts of which we quote:

(Letter of March 21, 1946 addressed to lessee's architect) :

"It has come to my attention that the rafters which form the roof framing have been overstressed and are sagging under the load they carry, also the girders between columns at the rear of the store are undersize and bowed."

(Letter of April 29, 1946, addressed to one of the lessees) :

"Recently Mr. Hargreaves, the City's Chief Building Inspector, made an inspection of the roof truss system for the main fore-part

of the store and he found that the trusses were not adequate both as to design and as to erection. Also that the main ceiling beams both for the front and rear part of the store are sagged and are evidently too light to carry the roof load. Also that the roof drainage system has proved to be inadequate.

"These factors make it mandatory upon me to refuse to allow continued occupancy of this structure beyond this summer season for fear of future heavy snow loading which might cause total beam and truss failure and consequent collapse of the roof structure."

We quote the lease, calling particular attention to paragraphs 3, 6, 8 and 11, insofar as those paragraphs cover matters of responsibility between the parties:

"Lease

"This Indenture Of Lease made and executed at Salt Lake City, Utah, on the 19th day of February, 1945, by and between Sarah White, owner of the premises hereinafter described, and James L. White, her husband, of Salt Lake City, Utah, hereinafter referred to as 'Lessors,' and Hubert Wolfe, Shirley Wolfe, his wife, Elliot Wolfe, Kayla Wolfe and Merrill Strong, copartners, all of Salt Lake City, Utah, doing business in Salt Lake City, Utah, under the firm name and style of 'Wolfe's Department Store,' which copartnership is also bound in this lease as 'Wolfe's Department Store,' of co-partnership, by Hubert Wolfe, managing partner, hereinafter referred to as 'Lessees,'

"Witnesseth:

"That said parties do mutually covenant, grant and agree to and with each other as follows:

"(1) Lessors do hereby grant, lease and demise unto the Lessees, for a term to commence on the 7th day of March, 1945, and to end on the 31st day of May, 1956, the following described premises located in Salt Lake City, Utah, to wit:

"The one-story building, basement and balcony, commonly designated as 248-256 South State Street, having dimensions of approximately 78 feet 3 inches on State Street, by 123 feet 6 inches in depth.

together with the use of the right-of-way immediately south of the Keeley store at 260 South State Street, and together with the use of the loading platform in the rear of the premises herein leased, it being understood that the buildings and parking space West of said loading platform are now leased to and are being used by Keeley's Incorporated and other tenants, who have the exclusive right to use said parking space. Said premises are to be occupied for the conduct of a mercantile business, which will not compete or conflict with the business

now being conducted by Keeley's Incorporated at 260 South State Street.

"(2) The Lessees shall pay to the Lessors as rent for said premises during the term thereof as follows:

"The total sum of Eighty Thousand One Hundred Thirty Dollars ($80,130.00), payable in monthly installments of Five Hundred Fifty Dollars ($550.00) each for the months commencing March 7, 1945 to June 6, 1946, a period of fifteen (15) months, the sum of Four Hundred Eighty Dollars ($480.00) for the period commencing June 7th, 1946, and ending June 30th, 1946, and Six Hundred Dollars ($600.00) per month for the nine years and eleven months period commencing July 1st, 1946 and ending May 31st, 1956, each in advance on the first day of each and every month during said period.

"(3) The rental for the last ten year term of this lease is fixed at Six Hundred Dollars ($600.00) per month, upon the express condition that the Lessees will, and they hereby agree to, at their own expense make permanent improvements to the building herein leased, including the installation of a first-class front therein, which improvements shall cost no less, but may cost more than Ten Thousand Dollars ($10,000.00). Said Ten Thousand Dollars ($10,000.00) shall not include the cost of trade fixtures, or any other removable fixtures, but shall include only the cost of permanent improvements to the building. If it should develop that necessary permanent improvements can be made for less than Ten Thousand Dollars ($10,000.00), then the rent for the last ten year term of this lease shall be increased Ten Dollars ($10.00) per month, or fraction thereof, for every thousand dollars, or fraction thereof, that the permanent improvements cost less than Ten Thousand Dollars ($10,000.00), and for the purpose of determining the fact, Lessees agree at the completion of said permanent improvements to furnish Lessors with an itemized statement of the cost of permanent improvements made as aforesaid. The said permanent improvements are to be commenced on or before June 7th, 1946, or as soon thereafter as Government restrictions will permit. Rental shall be paid during the time said improvements are being made. All such permanent improvements and construction shall be completed free and clear of all liens and claims of contractors, subcontractors, mechanics, laborers, materialmen and other persons having similar claims. All such permanent improvements shall upon installation become part of the realty and shall be surrendered to the Lessors in good order and condition as when constructed, reasonable wear and tear and damage by fire or other casualty excepted. After said permanent improvements are made, it is agreed that further structural changes shall not be made to said premises by the Lessees, without first obtaining the written consent of the Lessors, which consent Lessors covenant will not unreasonably be withheld.

"(4) Lessees shall also pay all charges for light, heat, electricity, gas and water consumed upon the demised premises during the term of this lease.

"(5) It is understood and agreed that the premises herein leased are presently leased to Daniel Stewart, doing business as 'Stewart Novelty Company,' until June 6, 1946, at Five Hundred Fifty Dollars ($550.00) per month, and that this lease is made subject to that lease. It is further agreed that the Lessors shall collect the rents from Stewart Novelty Company for the terms ending June 6, 1946, and providing the said rents are paid by Stewart Novelty Company, it is agreed that the Lessee will have no further obligation under this lease for the term ending June 6, 1946, and likewise will not be entitled to the possession of said premises for said term. If Stewart Novelty defaults in the payment of rent, however, then the responsibility of the Lessees for the term ending June 6, 1946 will commence, and in case of such default the Lessees agree to pay said rental in accordance with the terms hereof, and in such event will be entitled to all of the Lessors' rights and remedies against Stewart Novelty Company by reason of said default.

"(6) In consideration of the rental herein fixed, *the Lessees agree to and do hereby accept said premises in the condition and state of repair they are now in, and for the last ten years of this lease, all improvements, upkeep and repairs, of every kind and nature whatsoever, regardless of the extent thereof and whether the same be ordinary or extraordinary, and regardless of how the same may be necessitated, except as hereinafter stated,* including repair and upkeep of the heating plant and replacement of all glass, including plate glass broken, are to be made at the expense of the Lessees. If plate glass insurance is carried, it shall be carried at the expense of the Lessees.

"(7) Lessees agree that at the expiration of the term of this lease they will yield and deliver up the said demised premises to the Lessors, in as good order and condition as the same will be after the initial permanent improvements above contemplated are completed, reasonable use and wear thereof and damage by the elements excepted. Lessees agree to occupy said premises in a lawful manner and to keep the water pipes and their connections and sewage pipes and their connections upon said premises at all times in good condition and state of repair.

"(8) *For the entire term of this lease the Lessors shall have the obligation to keep the roof of the leased premises in good condition and repair;* to pay general taxes and lighting assessments levied against said property, all fire insurance premiums and premiums on any other insurance the owner elects to carry.

"(9) Lessees covenant and agree not to assign, transfer, hypothecate or mortgage this lease, or any interest therein, without first obtaining the written consent of the Lessors, which consent Lessors covenant will not unreasonably be withheld. If such consent is given by the Lessors, it is understood and agreed that the Lessees shall continue to remain liable under all the terms, covenants and conditions of this lease.

"(10) If the rent above reserved, or any part thereof, shall be unpaid on the date whereon the same is due and payable, and for fifteen days thereafter, or if default shall be made in any of the covenants herein contained to be kept by the Lessees, their heirs, executors, administrators or assigns, it shall and may be lawful for the said Lessors, their heirs, executors, administrators, agents, attorneys or assigns, to take possession of the demised premises, and every part thereof, either with or without legal process, and without notice to quit to re-enter and the same again to repossess and enjoy as in their first and former estate.

"(11) Lessors shall not be liable for any damage occasioned by failure to keep said premises in repair and shall not be liable for any damage done, caused or occasioned by or from plumbing, gas, water, steam or other pipes, or the bursting, leaking or running of any washstand, tank, water closet or wastepipe, in, upon or about said building or premises, nor from any damage occasioned by water arising from acts or neglect of neighboring tenants.

"(12) If Lessees shall abandon or vacate said premises, the same shall be re-let by the Lessors for such rent and upon such terms as Lessors shall see fit, and if a sufficient sum shall not be thus realized, after paying the expenses of such re-letting and collecting to satisfy the rent hereby reserved, the Lessees agree to pay and satisfy all deficiency.

"(13) Lessees agree that if the estate created hereby shall be taken upon execution or any other process of law, or if the Lessee shall be declared bankrupt or insolvent, or any receiver be appointed for the business and property of the Lessees and be not discharged within 60 days, or if any assignment shall be made of the Lessees' property for the benefit of creditors, or if Lessees shall apply for reorganization or any extension agreement with their creditors under any federal or state law now in force or hereafter enacted, then and in that event Lessors shall have the option of terminating this lease, or in their discretion, of exercising any and all other remedies to which they may be entitled as a matter of law.

"(14) It is agreed that the rent and charges above resolved shall be a first lien on the furniture, fixtures and personal property of the Lessees, and that said property shall not be removed from said premises until the rent and other charges are fully paid.

"(15) No waiver of any breach of any covenant, condition or stipulation herein contained shall be taken to be a waiver of any succeeding breach thereof, and the acceptance of rent during any period in which the Lessees may be in default shall not be deemed to be a waiver of such default.

"(16) The Lessors covenant and agree that the Lessees upon paying the rental herein provided and performing all of the covenants and agreements herein contained, shall and may in accordance herewith peacefully and quietly have, hold and enjoy said demised premises during the term hereof.

"(17) If Lessors commence and successfully prosecute any action against the Lessees to protect or enforce any of Lessors' rights hereunder, or if Lessors defend successfully in any action or proceeding by the Lessees against the Lessors, the Lessees will pay to Lessors a reasonable attorney' fee in each such action, and Lessees shall likewise receive a reasonable attorney's fee if they are successful in each such action.

"(18) In the event that the demised premises shall be destroyed by fire or the elements before or after the commencement of the term herein specified, this lease shall wholly cease and terminate. In the event that said premises are rendered untenable by fire or the elements, Lessors agree to repair and restore said premises with reasonable dispatch. In case of such repairs the rent due hereunder shall abate during the making of the same.

"(19) That the Lessees, their heirs, executors, administrators or assigns, shall have the right and option to lease said premises for a further term of ten years, commencing June 1st, 1956, on the same terms and conditions as apply to the period of the present lease, commencing June 7th, 1946, except for rental and except that during said extended period Lessees shall not be obligated to make permanent improvements provided in paragraph 3 hereof. Said right and option to release shall be exercised by the Lessees by serving written notice upon the Lessors, their heirs, executors, administrators or assigns, at least six months prior to May 31st, 1956, which notice shall be to the effect that said Lessees do then exercise said option. If such written notice is not served by the Lessees upon the Lessors within the time and in the manner stated, then said option shall expire. If said notice is served within the time and in the manner in this paragraph stated, the rental for the extended term shall then be fixed by agreement between the parties at a minimum of Six Hundred Fifty Dollars ($650.00) per month, and at a maximum of Eight Hundred Fifty Dollars ($850.00) per month, said determination to be made in accordance with the then going rate of rental and business conditions as they then exist. If and after said option is exercised by the Lessees, and if the parties cannot then agree on a rental between

said minimum and maximum, then each shall appoint an arbitrator and the two so appointed shall choose a third and a majority of the three shall fix the monthly rental to be paid by the Lessees to the Lessors between the minimum and maximum herein stated, and their decision shall be binding upon the parties hereto.

"(20) No remedy herein conferred upon the Lessors shall be considered exclusive of any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute.

"In Witness Whereof the said Lessors and Lessees have hereunto executed this agreement the day and year first hereinabove written.

"(Signatures)."

(Italics added.)

The Lessees alleged that they were unable to get Lessors to remedy the situation and therefore did the work themselves. They ask for reimbursement for those expenditures, for damages, and attorneys fees. The letters from the Salt Lake Bureau of Mechanical Inspection to Lessees' architect and to one of the Lessees, from which we have quoted above, are incorporated as part of the pleadings. The lease is also made part of the pleadings.

The general rule is: In the absence of a covenant on the part of the lessee to repair the leased premises as required by public authority or to make alterations or improvements required by public authority, that obligation falls upon the shoulders of the landlord. 32 Am. Jur. 525, Sec. 661; 33 A. L. R. 530. This rule is not the rule applicable as to repairs generally, where the lease is silent as to the responsibility—the general rule under such latter circumstances places the burden upon the lessee. 32 Am. Jur. 581, Sec. 705.

Let us consider the present lease, Paragraph 6 says that the Lessees

*"accept said premises in the condition and state of repair they are now in."*

According to the briefs of the parties the lower court seemed to lay considerable stress upon this provision. But what about paragraph 8 which provides that

*"For the entire term of this lease the Lessors shall have the obligation to keep the roof of the leased premises in good condition and repair * * *"*

If it may be properly inferred from the first quotation— the one from paragraph 6—that the Lessors would not be responsible for a roof in bad condition at the time of the execution of the lease then we have a situation wherein the inferences of that quotation are in conflict with those of the declaration of the second quotation—from paragraph 8— as the Lessors were, during the *entire* term of the lease and under the second quotation, to keep the roof in good condition, which implies that at the time of the lease it was in good condition, otherwise the Lessors would not have agreed to *keep* it in that condition. The obligation to keep the roof in good condition and repair for the entire term of the lease eliminates the thought that the Lessees would have to put the roof in good condition before that obligation fell on the shoulders of the Lessors.

However, the lease between the parties was entered into February 19, 1945. Paragraph 6 of the lease when it refers to the condition of the premises as "they are now in" refers to that date. The plaintiffs do not at any point in their complaint indicate that the roof was not in "good condition and repair" on that date. In fact, the allegations in the amended complaint are to the effect that the Lessees never examined the roof, but relied on Lessors statements as to its condition at all times. The plaintiffs then allege that A. B. Paulson, architect, on their behalf, applied to the proper city officials for permission to remodel the front of the building and was informed by them that the roof was unsafe. The letter dated March 31, 1946, from the Bureau of Mechanical Inspection, which is a part of the complaint, contains this: (see quotations above)

"* * * the rafters which form the roof framing have been over-stressed and *are sagging* under the load they carry. * * *" (Italics added.)

It also indicates that Lessors (or one of them) was notified of this condition January 22, 1946. The other letter from the Salt Lake Bureau of Mechanical Inspection, dated April 29, 1946, addressed to Mr. Hurbert Wolfe, one of the Lessees, indicates more particularly what the defects are and indicates also that the roof drainage system had proved inadequate. It is to be noted that at no time in either of the letters is there any determination as to when the condition first developed, or how long it has existed. The nature of the defect is not such as to indicate the time of its development. Approximately eleven months passed from the time of signing of the lease before any indication came that there were defects in the roof.

The plaintiffs by their amended complaint allege that:

"* * * *after the lease was entered into the roof commenced to sag * * * which sagging gradually became worse.* * * * that in January 1946 the plaintiffs first learned that the roof was actually dangerous and unsafe * * * that *the said roof was unsafe and was not in good condition and repair at that time in January 1946,* [not date of lease] *and became progressively worse* so that when plaintiffs were to take physical possession of the property *the roof had become so unsafe* as to be dangerous to life and limb * * * that *the sagging* of the roof *became progressively worse* and the roof was dangerous and unsafe because of the matters and things heretofore set forth and because of the * * * [Here the complaint sets out the exact defects], * * * and on or about June 7, 1946 by reason of said conditions *the roof had become dangerous and unsafe* * * * that plaintiffs do not know when the said roof first became dangerous and unsafe but said unsafe condition *became progressively worse from the date of said lease* * * *" (Italics added.)

The pleadings obviously refer to conditions *after* the execution of the lease.

Now, what about the provision of paragraph 6 which says: ■

*"\* \* \* and for the last ten years of this lease, all improvements upkeep and repairs of every kind and nature whatsoever, regardless of the extent thereof and whether the same be ordinary, or extraordinary, and regardless of how the same may be necessitated, except as hereinafter stated \* \* \* are to be made at the expense of the Lessees."?*

The writer is inclined to believe that the

*"except as hereinafter stated"* phrase is an exception to *"all improvements, upkeep and repairs of every kind and nature whatsoever, regardless of the extent thereof and whether the same be ordinary or extraordinary,"*

and would authorize, as an exclusion from this over-all duty of the Lessees, the provisions of paragraph 8 (quoted) as to the roof. There is, however, a reason why it is unnecessary to decide this point.

The *"last ten years of this lease"* is from May 31, 1946 to May 31, 1956. This all-inclusive improvement—upkeep —and repair provision did not mature as an obligation of the Lessees until May 31, 1946. The condition of the roof of which complaint is made developed prior to that time; and the obligation of correcting it arose prior to that time. With this provision out of the way by reason of its lack of maturity, we have a situation wherein at the time of the discovery of the defect the Lessees had not undertaken repairs or changes incident to any cause. The law we have cited above places the burden as to requirements by building authorities under such circumstances on the shoulders of the Lessor. The law in this case, we think, is strengthened by the terms of paragraph 8 specifiedly placing responsibility for the roof on the shoulders of the Lessor.

The suggestion of the Lessors that only ordinary repairs were contemplated by paragraph 8—that structural changes were not contemplated, would be stronger if the word "repair" was the only word used in paragraph 8 as descriptive of the Lessors' duties. "Good condition" we discussed above. Even the word "repair" how-

ever has a relative meaning. There is implicit in the maintenance of any part of a building the purpose for which that part is intended to function. Quite aside from the danger to those who may be under it at the time, what difference does it make to the Lessee whether the roof leaks in a few worn spots or drops the entire load of snow or water by the weakening and giving away of supports. The public authorities are, of course, concerned with the danger to the public; but that does not mean that the Lessees are indifferent to the lack of impervious qualities of the roof as a roof, be the cause what it may. A faulty construction or remodeling of the roof may lead to quicker wearing out, but it doesn't change the meaning of "repair."

The Lessors have called our attention to paragraph 11 as excusing them from performance. Such a provision merely seeks to avoid the result of injuries incident to the failure of the Lessors to act—injuries such as might arise out of a defective condition of the premises. It does not nullify or modify the Lessors duty toward the Lessees to comply with the terms of the lease. 32 Am. Jur. 615, Sec. 739; *Kirshenbaum* v. *General Outdoor Adv. Co.*, 258 N. Y. 489, 180 N. E. 245, 84 A. L. R. 645, 654, et seq.

We are of the opinion that the demurrer to the complaint should have been overruled. The judgment of the lower court is set aside and the case remanded for further proceedings conforming to this opinion.

McDONOUGH, C. J., and WADE, J., concur.

WOLFE and LATIMER, JJ., concur in the results.