WOLFE et al. v. WHITE et al.

No. 7431.   Decided December 18, 1950.   (225 P. 2d 729.)

See C. J. S. Landlord and Tenant, Sec. 368. Remedy of tenant upon landlord's breach of covenant to repair, see note, 116 A. L. R. 1228. See, also, 32 Am. Jur. 592.

*Mulliner, Prince & Mulliner* and *Alvin I. Smith*, all of Salt Lake City, for appellants.

*Rich & Strong*, and *Shirley P. Jones*, all of Salt Lake City, for respondents.

PRATT, Chief Justice.

This case was before the .court on a previous appeal, on a question of the sufficiency of the pleadings to withstand a general demurrer. See *Wolfe* v. *White*, 114 Utah 37, 197 P. 2d 125. In that case the lease involved was set out in full, and certain of the exhibits, included in

the pleadings, were considered.

The controversy centers around the lease of a store building on the west side of State Street, in Salt Lake City, and the determination of whether the lessors or the lessees are to be held for the cost of replacement of the entire roof on those premises under the terms of the lease.

The case was submitted to the jury on the theory that the obligation to repair the roof rested with the landlord, and that this obligation, under the lease, included placing the roof in repair, if out of repair, before the tenant undertook occupancy. This is in accord with the previous decision of this court in this case as to the interpretation of the terms of the lease. The issues submitted to the jury were (1) whether the roof was out of repair and not in good condition on and prior to June 7, 1946, the date plaintiffs were to occupy the premises; (2) whether the defendants (lessors) had notice of the condition and reasonable opportunity to repair and failed to do so; (3) the damages recoverable by the plaintiffs if the jury found the roof had to be repaired. In this latter connection the court instructed the jury that in any event the lessors would be liable only for the most economical means of fixing the roof.

The jury determined the issues in favor of the plaintiffs and while the errors stated in this appeal include one that the evidence fails to sustain the jury's verdict, this point is not submitted nor argued in the briefs. The evidence is in conflict and we see no reason for questioning the jury findings upon this factual issue.

During the preliminary controversy over this lease, and before the roof was repaired and the issues submitted to the courts, Mr. White in a letter to Mr. Wolfe stated defendants' position as follows:

"It has always been our contention that the provision, 'the lessors shall have the obligation to keep the roof of the leased premises in good con-

dition and repair,' refers to, and was clearly understood by the parties to the lease to refer to, repair and/or replacement of the roofing material above the roof structure, commonly referred to as the roof, and ordinarily repaired by a roofer in case of leakage. This is still the contention of the lessors of the building."

In a sense this is an admission that the obligation of repair rested upon the shoulders of the landlord; but that plaintiffs were claiming too much repair as falling within that obligation.

Upon this appeal the appellants' theory is somewhat different. They contend that since lessees agreed in the lease to accept the premises in the condition they were in (par. 6 of the lease) this eliminates any duty on the part of the lessors under this covenant to keep the roof in good condition and repair, to make any repairs to improve the condition of the roof and roof drain system beyond the condition it was in at the time it was accepted. They also contend that the phrase "keep in good condition and repair" (par. 8 of the lease) does not include "put in good condition and repair." We decided this issue in our previous decision of this case. It is a matter of the interpretation of the language of this particular lease.

In 2 Underhill, Landlord and Tenant, 857, Sec. 515, the author states the rule to be:

"The landlord's covenant to repair binds him not only to keep the premises in good condition but also to put them in good condition though the tenant may have entered. Hence, a lessor's covenant to keep premises in good repair is not necessarily equivalent to an agreement to keep them in the same condition as they are when they were leased. The premises may be, when leased, so old and dilapidated as to be uninhabitable and to claim that the owner of the premises may, with the knowledge of their condition lease them for the purpose of a dwelling house or hotel, for example, with an express covenant on his part that he will keep them in repair and yet be under no obligation to put the premises in a habitable condition is contrary both to common law and to common sense. If the lessor covenants to keep the premises in repair, he must put them in such a condition that they shall be reasonably fit for the occupation of the tenant. He must put the premises in good repair and keep them so under his covenant though he might not have to do either if he had not covenanted to do so. To construe a lessor's covenant to keep in repair otherwise would be

simply permitting him to maintain the premises in the state in which they were leased, and if they were dilapidated, uninhabitable and out of repair at that time he might permit them to continue to be so during the whole lease and yet satisfy his covenant to keep in repair. * * *"

In the case of *Kreppelt* v. *Greer,* Mo. App., 218 S. W. 354, 356, a Missouri case, there was contained in a lease covenant that the lessor "will keep the foundation, the walls * * * of the building on said premises in good condition for the purpose of the tenancy hereby created." It was argued in the case that this covenant must be construed with reference to the condition of the walls and foundation when the covenant was entered into. The court held to the contrary, stating:

"The only fair and reasonable construction which in our judgment can be placed upon this covenant is not that the foundation and walls, if in a defective condition at the commencement of the lease so as not to be in good condition for the purposes of the tenancy thereby created, shall be permitted to remain so, but must be construed to mean that if the foundation and walls of the building on said premises were not in good condition for the purposes of the tenancy at the time the lease began, it was the duty of the lessor, under this covenant, to put the walls and foundation in such condition at or before the commencement of the lease and keep them so during the term. *Myers* v. *Burns,* 35 N. Y. 269; *Olson* v. *Schultz,* 67 Minn. 494, 70 N. W. 779, 36 L. R. A. 790, 64 Am. St. Rep. 437; *Miller* v. *McCardell,* 19 R. I. 304, 33 A. 445, 30 L. R. A. 682."

In addition to this case and the cases cited therein, see the following to like effect: *Lehmaier* v. *Jones,* 100 App. Div. 495, 91 N. Y. S. 687; *Belgus Realty Corp.* v. *Irom,* 125 Misc. 870, 212 N. Y. S. 285; *Tinsley* v. *Smith,* 115 App. Div. 708, 101 N. Y. S. 382, and *Piper* v. *Fletcher,* 115 Iowa 263, 88 N. W. 380.

If the appellants' present construction of the two provisions of the lease heretofore referred to (pars. 6 and 8) is correct, then this, together with the jury's determination that the roof had to be repaired because it was not in good condition and repair at a time before the lessees went into occupancy, would mean that the lessors were only required to keep the roof in a state of disrepair where it was unsafe

and the building thus incapable of use for the purpose for which it was leased, in order to satisfy their covenant to "keep in good condition and repair."

"Good condition and repair" is a relative phrase, but it does not mean just any condition in which the building may be found. Apparently neither party actually knew the condition of the roof at the time of the execution of the lease. Later it was discovered to be defective. It was out of good condition and repair. Who was to put it in? If the parties intended to contract that the landlord would "maintain the roof in its present state", it would have been a simple matter for them to have so indicated. The lease was drawn by the landlord, and is to be construed most strongly against him where a question of conflicting meaning arises.

In our former decision in this case the court said:

"Let us consider the present lease. Paragraph 6 says that the Lessees *'accept said premises in the condition and state of repair they are now in.'* According to the briefs of the parties the lower court seemed to lay considerable stress upon this provision. But what about paragraph 8, which provides that *'For the entire term of this lease the Lessors shall have the obligation to keep the roof of the leased premises in good condition and repair* * * *.'* If it may be properly inferred from the first quotation —the one from paragraph 6—that the Lessors would not be responsible for a roof in bad condition at the time of the execution of the lease then we have a situation wherein the inferences of that quotation are in conflict with those of the declaration of the second quotation—from paragraph 8—as the Lessors were, during the entire term of the lease and under the second quotation, to keep the roof in good condition, which implies that at the time of the lease it was in good condition, otherwise the Lessors would not have agreed to *keep* it in that condition. The obligation to keep the roof in good condition and repair for the entire term of the lease eliminates the thought that the Lessees would have to put the roof in good condition before that obligation fell on the shoulders of the Lessors." [114 Utah 37, 197 P. 2d 130.]

Thus, either the roof was in good condition as inferred from the covenant, or it was the obligation of the lessor to put it in good condition, either of which would be justified under the terms of the lease. In the previous decision we indicated that no obligation as to repair of the roof rested

with the lessees. Their covenant as to repairs generally was for the last 10 years of the lease, whereas the obligation on the part of the lessors to "keep the roof in good condition and repair" covered the entire term of the lease. The two do not refer to the same thing.

The only reasonable construction to be given the two apparently conflicting provisions (cited above as paragraphs 6 and 8) which would give meaning to both is that the lessees agreed to accept the premises in ■ their then existing condition subject to the duty of the lessor to see that a roof in good condition and repair was available to them at all times, including the time they were to begin occupancy.

The appellants complain of the refusal of the court to give certain instructions which they say embrace their theory of the case. In view of the fact that we uphold the lower court in his construction of the contract of lease, the theories which the appellants sought to have injected into the case were improper, being based on a different interpretation of the contract, which matter was settled by the trial court. The jury was properly instructed that the lessees could recover only if they found that the roof was not in good condlition and repair and was properly instructed as to the extent and nature of lessors' obligation with relation to the condition in which the roof was to be placed.

The respondents have cross-appealed on the question of the award of damages, citing as error the deletion by the trial court of certain items of damages awarded them by the jury.

The court submitted the issues on damages to the jury in a verdict which required findings on five separate items: (1) the reasonable amount expended by plaintiffs to put the roof in good condition and repair; (2) the monthly rental plaintiffs were required to pay for occupying the old store; (3) the loss of rental opportunity to sub-lease the

old store; (4) the percentage rental plaintiffs were required to pay while occupying the old store; (5) attorney fees. Items (2), (3) and (4) are the ones involved in the cross-appeal.

At the time the White lease was executed, the plaintiffs were occupying premises owned by the Snell Estate, at 224-226 South State Street, in Salt Lake City, under a lease, the terms of which extended to October 31, 1945. The White lease was executed February 19, 1945, but possession under the lease was not to be given until June 7, 1946. It was necessary then that arrangements be made by plaintiffs to remain in possession of the Snell property from November 1, 1945, to June 7, 1946.

The defendant James L. White, was informed of the Wolfe-Snell lease, and was informed that the plaintiffs would be required to make some arrangements to stay in possession of the Snell premises until they could occupy the newly leased premises. Plaintiff, Hubert Wolfe, testified that he was unable to obtain a short term lease and this seems to have been consistent with conditions then existing, as defendant, James L. White, verified the fact that a short term lease on such property was not easily obtainable. Plaintiffs finally took a two year lease on the Snell property.

Plaintiffs were unable to occupy the White property until November, 1946; the delay being occasioned by the prolonged negotiations as to repair of the roof, and by reason of the time expended in repairing the roof. The plaintiffs occupied the Snell premises for three months during which they should have had occupancy of the White premises, and they paid rent thereon during that time under the terms of the Wolfe-Snell lease which required payment of $375 per month, fixed rental, and 2½ per cent of all gross sales in excess of a designated figure.

In addition, plaintiffs paid four months fixed rental under

the Wolfe-Snell lease after they went into occupancy of the White premises, and before the lessors voluntarily cancelled the Wolfe-Snell lease, in February 1947.

Plaintiffs introduced evidence indicating that they had secured a sub-lease for the Snell premises contingent upon his obtaining possession in August 1946, so that he might have the advantage of the winter holiday business, and that when possession of the White property was delayed until November 1946, and plaintiffs were required to stay in possession of the Snell property, the prospective lessee refused to sub-lease the premises. Again, this seems consistent since James L. White, indicated in his testimony that, "when you have only a short term, it is difficult to get anyone to go into business" and, "Nobody will go in business on a year's lease".

The jury awarded $1500 for the four months period during which plaintiffs paid rent under the Wolfe-Snell lease when they were in possession of the White property. That is, four months, at $375 per month. [Item (3).] Thereafter, after a motion for new trial had been argued, the court deleted entirely the $1500 awarded under this item.

It is contended that the trial court erred in deleting the $1500 item, for the reason that the facts surrounding plaintiffs' lease of the Snell premises under the Wolfe-Snell *lease, were known to defendants before the Wolfe-White* lease was signed in February, 1945, and that this item of loss was in the contemplation of the parties when that lease was signed. Plaintiffs cite the Restatement of Contracts, Section 330, as follows:

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it. Otherwise, it must be shown specifically that the defendant had reason to know the facts and foresee the injury."

The payment of rent to another lessor, under a totally

independent lease, is a collateral matter not ordinarily within the injuries which are foreseeable as a probable result of the breach of a lease such as here in question. However, if the defendant had special knowledge communicated to them before the signing of the Wolfe-White lease, they would then have reason to know and foresee these special damages.

The defendants knew that plaintiffs would be required to obtain an extension of their existing lease, and knew that it would be difficult to obtain a short term lease. They also knew that it would be difficult to sub-lease for a short term. With this knowledge, the defendants could be reasonably held to know that if plaintiffs could not deliver possession of the Snell premises to a sub-lessee in time to obtain the benefits of the holiday season or before the lease was near its expiration date, that plaintiffs would encounter difficulty in sub-leasing the premises. According to the evidence this is exactly what happened, as plaintiffs had the opportunity to sub-lease but lost their chance because possession could not be made available early enough to justify a sub-lessee in taking over the premises.

The facts are such that they present a question for the jury to determine and the jury having found in plaintiffs' favor, the finding was binding upon the court. The trial court erred in striking the $1500 item covering the four months period from the time the Snell premises ■ were vacated until the plaintiffs were released from their lease of that property by the lessors. The question before this court is one of law—whether the payments made for this four month period were a proper element of damages—and this court, having determined that they were, reinstates this part of the judgment.

The other matter raised on cross-appeal involves the action of the trial court in reducing item (2) from $2400 to $1125, which it did on its own initiative, and after the jury

had been discharged. The sum of $1125 represents three months fixed rental, at $375 per month. The appellants argue that the $2400 awarded under item (2) was intended to cover all rental on the old store, both fixed rental and percentage of sales rental, and therefore, the court erred in reducing this item to the fixed rental only.

The plaintiffs in their lease with the Snell Estate agreed to pay a fixed sum of $375 per month, plus 2½ per cent of all gross sales in excess of a designated figure. Both amounts were carried in the lease as rental for the premises. The total of the two was the amount of rent necessary for plaintiffs to pay to remain in the old location. As previously indicated, the form of verdict submitted to the jury specified the items upon which the jury should find the damages and item (2) as submitted to the jury, read as follows:

"With respect to additional monthly rental on the old store we render our verdict in favor of the plaintiffs and against the defendants in the sum of ........................................................................................$2400.00"

Item (4) was as follows:

"With respect to excess percentage rental paid by the plaintiffs on the old store, we render our verdict in favor of the plaintiffs and against the defendants in the sum of ........................................................................None."

Apparently the court used this form of verdict because of the manner in which the plaintiffs developed their evidence in connection with the damages suffered. It was so composed, apparently, to clarify the issues on damages which were being presented to the jurors. However, the wording is not the same as the instructions given by the court, as the wording used in Instruction No. 14, is as follows:

"The amounts awarded with respect to such items should not exceed:
For monthly rental on the old store .................................................$1,125.00
Excess percentage rental on old store ................................................ 2,856.84
Loss of rentals because of failure to sublease old store........................ 1,500.00"

The evidence on behalf of plaintiffs established with certainty the amount paid in the form of fixed rental and the amount paid by way of percentage rental. There was no evidence produced and the jury could not possibly find that for the three months claimed by plaintiffs at $375 per month, plaintiff had been damaged in excess of $1125. In order to exceed this figure, it would be necessary that the jury take into account some of the rent paid under the percentage provision. The issue under paragraph (2) submitted to the jurors could reasonably be interpreted by them to permit the inclusion of both fixed rental and percentage rental. They were not instructed that the two could not be combined. Apparently what the jurors did was to lump sums together as they exceeded the sum of $1125 for the fixed rental and awarded nothing for the percentage rental. The two items are carried in the same paragraph of the lease as monthly rentals. We therefore conclude, that the jurors misunderstood the limitations put on the items in the instruction and included both elements of damage mentioned in items (2) and (4) under item (2).

We need not, however, definitely determine a misunderstanding to hold that the trial court erred in the manner in which he disposed of this issue. When the jury returned its verdict it should have been apparent to the trial judge that the jury had misinterpreted the instructions and the limitations of the amounts set forth therein. If such is the case, then the jury should have been directed to further deliberate and clear up any discrepancies. Instead of doing this the trial judge accepted the verdict and some two days later, without either party having requested an amendment to the verdict, he reduced the amount from $2400 to $1125. In doing this, the court is of the opinion that he erred.

If the jurors bring in a verdict within the prayer of the complaint, but the trial judge thinks the amount

awarded is excessive, then he disposes of the issue on a motion for a new trial. He can either require a remission by the plaintiff and overrule the motion, if the plaintiff is willing to accept the reductions; or, he can grant a new trial. He cannot substitute his views on damages for those of the jurors. Neither can he change the verdict if there is a reasonable explanation of the inconsistencies.

Assuming that the verdict as rendered by the jury is inconsistent, the most that can be said is that the damages awarded were excessive. This could have been the grounds for a motion for a new trial by defendants, and plaintiffs could have presented their arguments as to why the verdict of the jury should be sustained. If the trial judge was then convinced that the damages were in excess of those which he believed could be awarded, he should have afforded plaintiffs an opportunity to take the remission, or have granted a new trial, as plaintiffs may have believed they were entitled to have another jury hear the cause.

We cannot correct the latter error in this court except by giving plaintiffs a new trial. While we have set forth reasons for the misunderstanding, we cannot for certainty eliminate other reasons. While we are convinced that the jurors did not intend to violate the court's instructions, it is possible they became so confused that the verdict as rendered was tainted with uncertainty. Plaintiffs, in their brief in this court, assert that if we cannot reinstate the amount stricken by the trial judge they prefer to have the verdict stand. This being their request, we must let this matter stand.

Respondents in their brief have submitted to this court a motion to grant additional attorney fees to compensate for this appeal. This motion is herewith submitted to the lower court for consideration.

The judgment of the lower court is hereby increased by the sum ·of· $1500, and as increased is affirmed, and the case remanded without prejudice to the consideration of the matter of additional attorney fees.

Costs on appeal to respondent. Each party to bear their own costs on cross-appeal.

WADE, WOLFE, LATIMER and McDONOUGH, JJ., concur.