WOODWARD COMMUNICATIONS, INC., and Great Northern
Insurance Company, Plaintiffs-Respondents,

v.

SHOCKLEY COMMUNICATIONS CORPORATION, and Trans-
portation Insurance Company, Defendants-
Appellants.

Court of Appeals

*No. 99–3268. Submitted on briefs June 23, 2000.—Decided
December 7, 2000.*

## 2001 WI App 30

(Also reported in 622 N.W.2d 756.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Edward A. Hannan* and *David J. Hanus* of *Hannan, Siesennop & Sullivan* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Steven B. Fisher* of *Daar, Fisher, Kanaris & Vanek, P.C.* of Chicago, Illinois, and *David Pliner, Esq.* of *Corneille Law Group, L.L.C.* of Madison.

Before Dykman, P.J., Vergeront and Deininger, JJ.

¶ 1.   VERGERONT, J.   The contract language at the center of this dispute provides that Shockley Communications Corporation, the seller of the assets of a radio station, "represents and warrants . . . [it shall] at its expense . . . keep in good repair and operating efficiency, all tangible personal property to be transferred to the Buyer," Woodward Communications, Inc. Shockley appeals a summary judgment determining that it breached this contractual provision because the communications tower subsequently collapsed as the result of a latent defect, and awarding Woodward $267,500 in damages.[1] We agree with Shockley that the circuit court erred in interpreting this language as

---

[1] Shockley's insurer, Transportation Insurance Company, is a defendant along with Shockley and also appeals. We refer to both appellants as "Shockley." Woodward's insurer, Great

494

an express warranty that the tangible personal property had no latent defects. Because there are no disputed facts and because Shockley is entitled to judgment that it did not breach this contractual provision as a matter of law, we reverse and remand to the trial court with instructions to dismiss the complaint.

## BACKGROUND

¶ 2.   On May 3, 1996, Shockley entered into an agreement with Woodward whereby Shockley agreed to sell and Woodward agreed to purchase the assets of WOLX-FM, a radio station in Baraboo, Wisconsin, for the sum of $10,500,000. One of the assets was a 640-foot communications tower, which the agreement designated as "tangible personal property." Section 13 of the agreement provided:

> Representations and Warranties by Seller. The Seller represents and warrants as follows:
>
> . . . .
> (h)   Seller, at its expense, shall keep in good repair and operating efficiency, all tangible personal property to be transferred to the Buyer.

The closing took place on July 29, 1996. At the time of closing, the radio station was operating and continued to do so until the tower collapsed during a wind and ice storm on December 31, 1996.

¶ 3.   The following facts concerning the cause of the collapse were stipulated by the parties. During the storm, a metal U-bolt, which was a component of one of the eight U-bolt anchor assemblies used to secure the tower to its base, broke without warning, causing the tower to collapse. The one-and-one-eighth inch diame-

---

Northern Insurance Company, is a plaintiff along with Woodward. We refer to both appellees as "Woodward."

ter U-bolt contained a hidden, internal defect in the nature of a microscopic, internal brittle crack, and this defect was a cause of the U-bolt breaking on December 31, 1996. The defect was created when the bolt was cast or forged, on or before 1948. The defective bolt was a component of one of the assembly anchors when the tower was erected in 1948, and the tower remained in place from the date it was erected until it collapsed. Between the time of the manufacture of the bolt and the tower's collapse, the defect "was a completely latent condition that was not detectable except by [certain] destructive, metallurgical tests. . . ." Between the date Shockley acquired the radio station and tower in 1985 and the date of the closing of the sale to Woodward, Shockley had the tower inspected by an outside firm on May 8, 1985, August 30, 1987, August 31, 1988, May 30, 1990, May 15, 1995, and May 13, 1996; and reports were prepared as a result of each inspection.

¶ 4. Woodward filed this action on January 5, 1998. The complaint contained a number of claims, but the only ones that concern this appeal are the breach of contract claim and the breach of express warranty.[2] On Woodward's first motion for partial summary judgment the circuit court concluded subsection 13(h) of the agreement was unambiguous and was an express warranty. However, at that time the court did not address the issue of whether the obligation to "keep in good repair and operating efficiency" was an express warranty against latent defects, as Woodward argued.

[2] Among the other claims contained in the complaint was a claim for breach of implied warranty. The court dismissed this claim after concluding Shockley was not a merchant under WIS. STAT. § 402.314 (1997–98) since the transaction was an occasional sale.

¶ 5. On Woodward's subsequent motion for partial summary judgment, the trial court determined the only remaining issues were whether the latent structural defect was the cause of the tower's collapse and what, if any, damages should be awarded. After discovery, the parties submitted a stipulation of facts on causation, which we have already referenced, and stipulated that the damage resulting from the tower's collapse was $267,500. Although we are unable to find in the circuit court's decision on Woodward's second motion for partial summary judgment, or elsewhere in the record, that the court explicitly ruled subsection 13(h) was an express warranty against latent defects, it appears the parties and the court understood the court had so ruled. After the stipulation on cause and damages, Woodward moved for entry of judgment in its favor. Without objection from Shockley, the court entered a judgment for the stipulated damages, determining in the judgment that Shockley had breached its express warranty to keep the tower in good repair and operating efficiency.

## DISCUSSION

¶ 6. We treat the trial court's judgment as a summary judgment, since the court's decision was based on submissions of the parties rather than live testimony. *See* WIS. STAT. § 802.08(2) (1998–98).[3] We review summary judgments de novo, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Generally, summary judgment is proper when there

---

[3] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

¶ 7.   On appeal Shockley argues that the language of subsection 13(h) is not an express warranty that there is no latent defect in the tower. Shockley contends, since it was unaware of the defect because it was·not discoverable by ordinary means, and since the defect did not affect the operating efficiency of the tower at the time of the closing, Shockley did not breach its obligation to keep the tower in good repair and operating efficiency solely because there was an existing latent defect. Woodward, on the other hand, contends the tower was not "in good repair and operating efficiency" solely because there was a latent defect at the time of the closing.

¶ 8.   Although the clause in dispute appears to be a standard one in contracts for the sale of the assets of radio and television stations and other businesses,[4] we have discovered no Wisconsin case that addresses the same or similar contract language. We therefore begin with the general principles of contract construction.

¶ 9.   The interpretation of a contract is a question of law, which we review de novo. *Edwards v. Petrone,* 160 Wis. 2d 255, 258, 465 N.W.2d 847 (Ct. App. 1990). The objective in construing a contract is to ascertain the intent of the parties from the contractual language. *Waukesha Concrete Prods. Co. v. Capitol Indem. Corp.,* 127 Wis. 2d 332, 339, 379 N.W.2d 333 (Ct. App. 1985). If the terms of the contract are plain and unambiguous, it is the court's duty to construe the contract according to its plain meaning even though a party may have construed it differently. *Id.*

---

[4] *See* NICHOLS, CYCLOPEDIA OF LEGAL FORMS §§ 7.4121, 7.4131 (Rev. 1997); 16 AM. JUR. 2D *Legal Forms* § 226.161 (Rev. 1994).

¶ 10. To place the disputed clause in context, we summarize other relevant portions of the agreement. The sale was not to be consummated until the Federal Communications Commission (FCC) had consented to the transfer of the license to Woodward, and the closing date was not to take place until after final FCC approval. The parties contemplated the FCC approval might take some time, as indicated by the provision terminating the agreement if final FCC approval was not granted within 240 days, with certain exceptions. Accordingly, the agreement addressed the conduct of the business from the date of the execution of the agreement to the closing date, providing that Shockley would operate the station during this time period and specifying Shockley's obligations in doing so.

¶ 11. Subsection 13(h) imposes on Shockley the obligation to "keep in good repair and operating efficiency" all tangible personal property to be transferred at closing. The subsection also imposes the additional obligation that Shockley bear the expense for doing so. Because the tangible personal property was to be used in the operation of the business by Shockley from the date of the execution of the agreement to the date of closing, which could be several months or more, the parties provided for the care of the tangible personal property, including the tower, during that time period. The phrase "keep in good repair and operating efficiency" uses commonly understood terms. "Keep" in this context conveys that, on the date of execution of the agreement, the tower was in good repair and operating efficiently. The entire phrase plainly requires that Shockley make any repairs and perform any maintenance necessary to keep the tower in a condition that permits it to operate efficiently.

¶ 12.    There is no suggestion in this phrase that Shockley is representing or warranting that there are no latent or hidden defects in the tangible personal property. It is true that, if a defect latent on the date of execution of the agreement were to cause the tower to need repairs or not to operate efficiently from that date to the date of closing, Shockley would have the obligation to make the needed repairs at its expense. However, if the latent defect does not affect the operating efficiency of the tangible personal property up until the date of the closing, and remains undiscovered by routine maintenance inspections, the language does not suggest Shockley has any obligation, or assumes any responsibility, with respect to that latent defect.

¶ 13.    We do not agree with Woodward that casting subsection 13(h) as an "express warranty" affects the interpretation of the language used in the subsection. The distinction between an express warranty and an implied warranty exists under the Uniform Commercial Code (U.C.C.), *compare* WIS. STAT. § 402.313 *with* WIS. STAT. §§ 402.314 *and* 402.315, and is significant, among other reasons, in resolving conflicts between warranties under the U.C.C. *See* WIS. STAT. § 402.317. In the context of deciding Woodward's claim of implied warranty, the court determined this transaction was not governed by the U.C.C. See footnote 2. Woodward does not argue that determination was incorrect nor does it direct us to any law apart from the U.C.C. that distinguishes between express and implied warranties or that creates implied warranties.[5]

---

[5] Woodward cites to *Ewers v. Eisenzopf*, 88 Wis. 2d 482, 487, 276 N.W.2d 802 (1979) (*quoting* U.C.C. WIS. STAT. § 402.313(1)(a)), for this definition of express warranty: "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes a [b]asis of the bargain."

¶ 14.  In any case, outside of the U.C.C., a warranty is simply ". . . an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for himself, and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dittman v. Nagel*, 43 Wis. 2d 155, 160, 168 N.W.2d 190 (1969). Since Shockley "represents and warrants" it will perform the obligations expressed in subsection 13(h), we agree with Woodward that it is entitled to rely on Shockley's assurance that it will do this, and is relieved of the duty of ascertaining whether Shockley has kept the tangible personal property in good repair and operating efficiency from the date of execution of the agreement to the date of closing. However, the use of the phrase "represents and warrants" does not transform subsection 13(h) into a warranty of a specific type—that is, a warranty that there are no latent defects.[6]

¶ 15.  The same is true with respect to two other contract provisions on which Woodward relies. Subsection 13(n) provides: "All of the representations and warranties by Seller contained in this agreement shall be true on and as of the Closing Date. All such representations, warranties and information shall be deemed to be made on and as of the Closing Date."

---

[6] Subsection 19(c) provides that "the representations and warranties of Seller made in this Agreement will survive the Closing for a period of two (2) years, except that the warranties of title to the real estate described in Appendix 1(a) shall survive the Closing for a period of three (3) years." The parties agree subsection 19(c) is a statute of limitations clause, meaning a suit for a breach of subsection 13(h) must be brought within two years of the closing.

Subsection 8(a)(vii) provides that on the closing date Shockley shall deliver to Woodward, among other items, "[a] certificate confirming the accuracy of Seller's representations and warranties as of the Closing." Because of these provisions, Shockley has not only warranted on the date of execution that it will keep the tangible personal property in good repair and operating efficiency until that property is transferred to Woodward on the date of closing, but Shockley is also warranting that, as of the date of closing, the tangible personal property will have been kept in good repair and operating efficiency, and it is warranting it will so certify at closing. This certification, in turn, is a condition, among many others, of Woodward's obligation to fulfill its obligations under the agreement.[7] However, the substance of the warranty concerning the tangible personal property that Shockley makes as of the date of closing depends upon the language of subsection 13(h). Calling Shockley's obligations a "warranty" or an "express warranty" does not alter that language.[8]

---

[7] Section 15 provides: "All obligations of Buyer under this Agreement are subject to the fulfillment, prior to or at the Closing Date, of the following conditions, any of which may be waived by the Buyer: . . . . (b) The representations and warranties of Seller contained in Section 13 of this agreement shall be true in all material respects at and as of the Closing Date. The Seller shall provide a certificate with respect to the accuracy of the representations and warranties in Section 13 on the Closing Date."

[8] We agree with Woodward that the clauses obligating Shockley to maintain insurance on the real and personal property (subsection 13(d)) and placing on Shockley the responsibility for casualty loss of the listed assets until the closing date, with the provision Shockley either promptly repair, replace, or restore the property to its condition prior to the loss or pay the insurance proceeds to Woodward in an ade-

¶ 16. Woodward refers us to a number of cases from other jurisdictions in support of its argument that the language of subsection 13(h) plainly means Shockley warranted there were no latent defects in the tower. However, we do not consider any of these cases persuasive, because the language of the contracts, the nature of the transactions and the facts of the alleged breach are not sufficiently similar to those in this case. *See, e.g., Wolfe v. White,* 225 P.2d 729 (Utah 1950) (landlord's promise to "keep [the premises] in good condition and repair" during lease term included fixing roof that was dilapidated at time tenant moved in); *Turner v. Central Hardware Co.,* 186 S.W.2d 603 (Mo. 1945) (representation by retail merchant that new ladder is "safe and sound" is express warranty that covers latent defect in wood); *J.A. Tobin Const. Co. v. Davis,* 81 S.W.2d 474 (Mo. Ct. App. 1935) (seller of used paving equipment breached contract provision that equipment "is to be in serviceable condition" when, upon delivery, buyer found equipment in unserviceable condition, even though buyer had previously inspected and approved equipment).

¶ 17. The term "latent defect" is a commonly used and understood term. Had the parties intended Shockley to warrant there were no latent defects in the tangible personal property, it would have been a simple matter for them to so state. We are satisfied that the terms the parties chose to employ in subsection 13(h), even when combined with the warranty-on-the-date-

_____

quate amount (subsection 15(a)) do not, in themselves, remove any obligations Shockley has under subsection 13(h). However, if Woodward intends to suggest, in addition, that the insurance and risk of loss clauses support its interpretation of subsection 13(h), we do not see how that is the case, and Woodward does not develop this argument.

of–closing language in subsection 13(n) and the certification obligation in subsection 8(a)(vii), do not encompass a warranty that there were no latent defects in the tower on the date of closing, as long as that defect neither necessitated repair nor interfered with the operating efficiency of the tower up to the date of the closing.

■

¶ 18.   In summary, we conclude that under subsection 13(h) Shockley was obligated to make all repairs and perform all maintenance between the date of the execution of the agreement and the date of closing that were necessary to keep the tower operating efficiently. Under subsection 13(n), Shockley was obligated to warrant on the closing date that it had kept the tower in good repair and operating efficiency up to the date of the closing. The tower had been inspected by an outside firm periodically after Shockley acquired the station in 1985, with the last inspection occurring on May 13, 1996, shortly after execution of the agreement. The report of the last inspection shows the condition of the various components of the tower that were inspected were "good" or "o.k." There is no evidence any repairs were necessary to keep the tower operating efficiently, from that inspection to the date of closing that were not done, nor is there any evidence the tower was not operating efficiently on the date of closing.[9]

---

[9] Woodward asserts in its statement of facts that Professor German Gurfinkel concluded to a reasonable degree of engineering certainty that "As of May 3, 1991, the tower was defective and was not in a state of 'good repair and operating efficiency.'" (Because of the context, we assume Woodward means May 3, 1996.) Professor Gurfinkel does express this opinion, as of the date of the closing, in the last paragraph of an

¶ 19. Finally, we conclude Shockley is entitled to a summary judgment that it did not breach its contract with Woodward and did not breach an express warranty. We therefore reverse the judgment entered in Woodward's favor and remand to the trial court with directions to dismiss the complaint.

*By the Court.*—Judgment reversed and cause remanded with directions.

affidavit Woodward submitted in support of its motion for partial summary judgment. The rest of the affidavit addresses the cause of the collapse of the tower and is consistent with the facts concerning the defective bolt and the cause of the collapse of the tower to which the parties later stipulated. Professor Gurfinkel's opinion in the last paragraph was not stipulated to by the parties. In essence, Professor Gurfinkel's opinion in the last paragraph of the affidavit is an opinion on the application of the disputed contract language to the undisputed facts concerning the cause of the collapse. This is the very issue the parties are disputing on this appeal, and it is a question of law for this court. We therefore do not consider Professor Gurfinkel's opinion.